**BURSOR & FISHER, P.A.**
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: bscott@bursor.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSY SAARLOOS, individually and on behalf of all others similarly situated,<br><br>                          Plaintiff,<br><br>        v.<br><br>THE COWBOY CHANNEL, LLC,<br><br>                          Defendant. | Case No.   5:24-cv-2058<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Lindsy Saarloos ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit brought against Defendant The Cowboy Channel, LLC ("Defendant") for violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.    The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

3.    The VPPA imposes civil liability on "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710.

4.    Defendant operates "[t]he Cowboy Channel[, which] is the official network of ProRodeo [(the Professional Rodeo Cowboys Association or PRCA)] and … features content focused on … bull riding, roping, reining, barrel racing, and other western sports genres, along with western fashion and music."[1]  This includes "SD and HD programs, and more than 55 family friendly television series from a program library of more than 5,000 hours."[2]

---

[1] COWBOY CHANNEL, ABOUT US, https://www.thecowboychannel.com/about-us.

[2] COWBOY CHANNEL, SYNDICATION, https://www.thecowboychannel.com/syndication.

5.     In addition to "enjoy[ing] distribution into 42 million homes on cable/satellite"[3] systems located throughout the country, "all of the great programming on [] The Cowboy Channel" is accessible "all day, every day, all year long[,]" through a platform called Cowboy Channel Plus ("CC+").[4]

6.     Specifically, Defendant's pre-recorded videos (i.e., rodeo archives, television series episodes, etc.) may be viewed on-demand through the Cowboy Channel Plus website: https://www.cowboychannelplus.com ("Website").

7.     Unbeknownst to Plaintiff and Class Members, Defendant knowingly and intentionally discloses CC+ users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.  By doing so, Defendant is violating the VPPA.

8.     Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## PARTIES

9.     Plaintiff Lindsy Saarloos is, and has been at all relevant times, a resident of Apple Valley, California and has an intent to remain there, and is therefore a citizen of California.

10.     Defendant The Cowboy Channel, LLC is a Delaware limited liability company with its principal place of business at 130 East Exchange Avenue, Fort Worth, Texas 76164.  Defendant owns and operates CC+, which is used throughout California and the United States.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

---

[3] COWBOY CHANNEL, ABOUT US, https://www.thecowboychannel.com/about-us.

[4] COWBOY CHANNEL PLUS, GIVE THE GIFT OF COWBOY CHANNEL +, https://www.cowboychannelplus.com/gift.  *See also* COWBOY CHANNEL, PACKAGES, https://www.cowboychannelplus.com/account/signup?target=tcc.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12.     This Court has personal jurisdiction over Defendant because Defendant collected and disseminated the personally identifiable information and video-viewing information giving rise to this lawsuit in this District, Defendant conducts substantial business in this District, and the conduct giving rise to this action arises out of and relates to that business.  Indeed, Defendant purposefully avails itself of the benefits of this District by selling subscriptions to its CC+ video service to persons whom Defendant knows to reside in this District (based on billing information provided to Defendant at checkout).[5]

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts and events giving rise to the claims occurred in this District and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### I.      History and Overview of the VPPA

14.     The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

---

[5] COWBOY CHANNEL PLUS, PACKAGES, https://www.cowboychannelplus.com/account/signup?target=tcc.

S. Rep. 100-599, at 5-6 (cleaned up).

15.    In 2012, Congress amended the VPPA, and in so doing, reiterated the VPPA's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."  S. Rep. 112-258, at 2.

16.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."   18 U.S.C. § 2710(a)(4).

## II.    Defendant is a Video Tape Service Provider

17.    CC+ provides subscribers with a library of thousands of hours of pre-recorded videos.  These include, *inter alia*, replays and recaps of the Professional Rodeo Cowboys Association; the National Finals Rodeo; "western sports" like timed events (i.e., barrel racing, breakaway roping, steer wrestling, tie-down roping, etc.), roughstock events (i.e., bareback riding, bull riding, and saddle bronc riding), team roping, and National High School Finals Rodeo; and episodes from equine television shows, western lifestyle television shows, and western sports television shows.[6]

18.    CC+ offers two paid subscription plans: "CC+ Monthly" for $9.99 per month (with all the foregoing content, excluding the National Finals Rodeo) and

---

[6] COWBOY CHANNEL PLUS, WATCH, https://www.cowboychannelplus.com/watch. *See also* COWBOY CHANNEL, PRORODEO, https://www.thecowboychannel.com/rodeo; COWBOY CHANNEL, WESTERN SPORTS, https://www.thecowboychannel.com/western-sports; COWBOY CHANNEL, SHOWS, https://www.thecowboychannel.com/shows.

"Everything We Got" for $119.99 per year (with all the foregoing content, including the National Finals Rodeo).[7]  To create an account and subscribe, individuals are required to provide their first and last name, email address, and phone number.[8]

19.    CC+ launched in or around May 2020[9] and is widely utilized throughout both California and the entirety of the United States.  On information and belief, there have been approximately 53,500 unique visits to the Website over the past month.[10]

### III.    Testing Reveals that Defendant Illegally Shares Class Members' PII and Video-Viewing Information with Third Parties

20.    Prior to the commencement of this action, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Website.  A "dynamic analysis" records the transmissions that occur from a user's device.

21.    The private researchers tested what information (if any) Defendant discloses when a user watches a pre-recorded video on the CC+ Website.

22.    The analysis revealed that Defendant discloses information sufficient to identify specific Class Members and the specific videos they watched to at least three third parties: Meta Platforms, Inc. ("Meta"); Google LLC ("Google"); and Yahoo Inc. ("Yahoo").

//

//

//

//

---

[7] COWBOY CHANNEL PLUS, PACKAGES,
https://www.cowboychannelplus.com/account/signup?target=tcc.

[8] COWBOY CHANNEL PLUS, ACCOUNT SIGNUP,
https://www.cowboychannelplus.com/Account/Signup.

[9] COWBOY CHANNEL, PRCA ON THE COWBOY CHANNEL+ APP,
https://www.thecowboychannel.com/prca-on-the-cowboy-channel-app.

[10] SIMILARWEB, COWBOYCHANNELPLUS.COM DOMAIN ANALYSIS,
https://www.similarweb.com/website/cowboychannelplus.com/#overview.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    5

23.    These disclosures were effectuated through, *inter alia*, the third parties' respective tracking pixels and/or tracking libraries: Google Analytics,[11] the Meta Pixel,[12] and the Yahoo Dot.[13]

24.    Per a research paper presented at the Association for Computing Machinery Web Conference 2023, "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[14]  "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[15]  "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[16]  Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Meta, Google, Yahoo)] servers[] … [and] report[s] to [the third party (i.e., Meta, Google, Yahoo)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[17]

25.    To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of

---

[11] GOOGLE, ANALYTICS OVERVIEW, https://marketingplatform.google.com/about/analytics/.

[12] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel/; META, WHAT IS THE META PIXEL?, https://www.facebook.com/business/tools/meta-pixel.

[13] YAHOO, BEACONS, https://help.yahooinc.com/dsp-api/docs/beacons; YAHOO, PIXELS, https://help.yahooinc.com/dsp-api/docs/pixels.

[14] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710. Note, this article specifically describes the Meta Pixel, but Google Analytics, the Meta Pixel, and the Yahoo Dot's mechanics and functions are substantially similar.

[15] *Id.*

[16] *Id.*

[17] *Id.*

JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[18] Once active, this code will load "a library of functions [(i.e., fbevents.js for the Meta Pixel; analytics.js, gtag.js, gtm.js, and/or optimize.js for Google Analytics; and ytc.js for the Yahoo Dot)] … on the website[.] … [These] librar[ies are] the core mechanism[s] of the [respective tracking p]ixel[s]."[19]    In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Meta, Google, or Yahoo], by defining *events*, i.e., actions, that a user takes on the website."[20] When in use, the tracking pixels then "report[] to [Meta, Google, and Yahoo] information about [each] event and [the] user that caused it," for Meta, Google, and Yahoo's "future use in ad-conversion and further user profiling and tracking[.]"[21]

26.    Defendant owns and operates the CC+ Website.  Defendant intentionally and knowingly integrated the Meta Pixel, Google Analytics, and Yahoo Dot tracking pixels and/or tracking libraries into the CC+ Website.

27.    The dynamic analysis found that when a CC+ Website user creates an account and watches a pre-recorded video on the CC+ Website, Defendant discloses the following information to Meta, Google, and Yahoo:

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Google Analytics/Ad Services** | Video Title, Video ID, Video URL | Hashed Email | Pseudonym ID, User interactions |
| **Yahoo Analytics** | Video Title, Video ID, Video URL | Hashed Email | - |
| **Meta (Facebook)** | Video Title, Video ID, Video URL, Video interaction events | - | FBP / Facebook ID |

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    7

## V.    Defendant Discloses Class Members' PII and Video-Viewing Information to Meta

28.    The dynamic analysis found that when a CC+ user watches a pre-recorded video on the Website, Defendant discloses to Meta, via the Meta Pixel, the user's (i) "Facebook browser ID value [] stored in the _fbp browser cookie[,]"[22] and (ii) the title and URL of the video the user is watching, including "event data"/video interactions.    This is evinced by the following network transmission from the CC+ Website:

**Meta Platforms, Inc.**, doing business as Meta, and formerly named Facebook, Inc., and TheFacebook, Inc., is an American multinational technology conglomerate based in Menlo Park, California. The company owns and operates Facebook, Instagram, Threads, and WhatsApp, among other products and services

We observed **Meta** obtaining:

**Video Information** in the form of:
- Video Title
- Video ID
- Video URL
- Video Interaction Events

**Personal Information** in the form of:
- 

**Other Information** such as:
- FBP / Facebook ID*

```
https://www.facebook.com/tr/
URL PARAM:
  id: 302036181041652
  ev: SubscribedButtonClick
  dl: https://www.cowboychannelplus.com/play/59784
  rl: https://www.cowboychannelplus.com/show/433
  if: false
  ts: 1715860540989
  cd[buttonFeatures]: {"classList":"jw-icon jw-icon-inline
jw-button-color jw-reset
jw-icon-fullscreen","destination":"","id":"","imageUrl":"","innerText":
"Fullscreen","numChildButtons":0,"tag":"div","type":null}
  cd[buttonText]: Fullscreen
  cd[formFeatures]: []
  cd[pageFeatures]: {"title":"Kimes Essence Exchange - Day 1 - Cowboy
Channel+"}
  cd[parameters]: []
  sw: 1440
  sh: 900
  v: 2.9.156
  r: stable
  ec: 1
  o: 4126
  fbp: fb.1.1715860234970.2037610603
  cs_est: true
  ler: empty
  cdl: API_unavailable
  it: 1715860438850
  coo: false
  es: automatic
  tm: 3
  rqm: GET
```

29.    That Defendant discloses to Meta, via the Meta Pixel, the user's Facebook browser ID value stored in the _fbp browser cookie is shown by the red highlights.

```
o: 4126
fbp: fb.1.1715860234970.2037610603
cs_est: true
```

---

[22] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com /docs/marketing-api/conversions-api/parameters/customer-information-parameters/. *See also* META, CLICKID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-pi/parameters/fbp-and-fbc.

30.     Per the Meta "Cookies Policy," the "'_fbp' cookie *identifies browsers* for the purposes of providing advertising and site analytics services[.]"[23]    Indeed, the browser ID value, along with other "customer information parameters[,]" is ultimately "matched to Meta accounts."[24]    Thus, through the Facebook browser ID value, an ordinary person can easily identify a specific user, as well as which specific user watched what video(s).    Here, the "Facebook browser ID value" was "fb.1.1715860234970.2037610603."    According to Meta, browser ID values are formatted as "fb.${subdomain_index}.${creation_time}.${random_number}."[25] Thus, the transmission includes the random, identifying number "2037610603."

31.     That Defendant discloses to Meta, via the Meta Pixel, the title and URL of the video the user is watching, including "event data"/video interactions, is shown by the yellow highlights.    Here, the title of the video was "Kimes Essence Exchange - Day    1."    The    URL    of    the    video    was "https://www.cowboychannelplus.com/play/59784."    The Meta Pixel also received "event data"/a video interaction titled "Fullscreen," showing that the user viewed the video in full screen mode.

```
dl: https://www.cowboychannelplus.com/play/59784
rl: https://www.cowboychannelplus.com/show/433
if: false
ts: 1715860540989
cd[buttonFeatures]: {"classList":"jw-icon jw-icon-inline
jw-button-color jw-reset
jw-icon-fullscreen","destination":"","id":"","imageUrl":"","innerText":
"Fullscreen","numChildButtons":0,"tag":"div","type":null}
cd[buttonText]: Fullscreen
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Kimes Essence Exchange - Day 1 - Cowboy
Channel+"}
```

[23] META, COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies (emphasis added).

[24] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.

[25] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com /docs/marketing-api/conversions-api/parameters/customer-information-parameters/.

## IV.    Defendant Discloses Class Members' PII and Video-Viewing Information to Google

32.    As summarized above, the dynamic analysis found that when a CC+ user watches a pre-recorded video on the Website, Defendant discloses to Google, via Google Analytics, the user's (i) hashed e-mail address, (ii) Google Analytics client ID ("a unique identifier [(i.e., string of numbers)] associated with each user" used "for Google Analytics to determine which traffic belongs to which user"[26]), and (iii) the title and URL of the video the user is watching.  This is evinced by the following network transmissions from the CC+ Website:



33.    That Defendant discloses to Google, via Google Analytics, the user's hashed e-mail address is shown by the blue highlights.



---

[26] GOOGLE, [UA] HOW USERS ARE IDENTIFIED FOR USER METRICS [LEGACY], https://support.google.com/analytics/answer/2992042.

34.     An e-mail address is a unique string of characters which designate an electronic mailbox.   As industry leaders,[27] trade groups,[28] and courts[29] agree, an ordinary person can use an e-mail address to uniquely identify another individual. Indeed, there exist multiple services that enable their clients to look up who owns a particular e-mail address.[30]

35.     Although Defendant discloses hashed[31] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[32]  Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[33] through SHA-256 and/or other hashing algorithms.

---

[27] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[28] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2020), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[29] *See United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[30] *See*, *e.g.*, EXPERIAN IDENTITY APPEND, https://docs.experianaperture.io/identity-append/experian-identity-append/overview/introduction/#reverse-email-append ("Reverse email append … allows you to input an email address and receive the name and address of the individual associated with that email.").

[31] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[32] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[33] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    11

36.     The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[34]

37.     Google, itself, informs advertisers who wish to "target[ ] Customer Match segments in [] Google Ads campaigns[]" that "Google keeps track of the email addresses and phone numbers for Google accounts and the corresponding hashed strings for those email addresses or phone numbers."[35]    Accordingly, Google can compare "each hashed string on [a given email] list with the hashed string for email address or phone number of Google accounts[]" to determine "[i]f there's a match[ with a] … corresponding Google account[.]"[36]

38.     Similarly, Yahoo tells advertisers that if they "use Online Enhanced Matching to pass SHA256 hashed email addresses along with [] pixel events to Yahoo" then "Yahoo matches the hashed email address against Yahoo data and uses [] deterministically matched ID[s] in [marketing] attribution and targeting workflows[.]"[37]

39.     Thus, even in hashed form, email addresses are traceable to individuals.

---

[34] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

[35] GOOGLE, ABOUT THE CUSTOMER MATCHING PROCESS, https://support.google.com/google-ads/answer/7474263.

[36] *Id.*

[37] YAHOO, ENHANCED MATCHING, https://help.yahooinc.com/identity/docs/enhanced-matching.

40.    That Defendant discloses to Google, via Google Analytics, the user's Google Analytics client ID is shown by the red highlights.



41.    That Defendant discloses to Google, via Google Analytics, the title and URL of the video the user is watching, is shown by the yellow highlights.  Here, the title of the video was "Kimes Essence Exchange - Day 1."  The URL of the video was "https://www.cowboychannelplus.com/play/59784."



42.    Although Defendant discloses a user's video-viewing information to Google in a separate transmission from the user's hashed e-mail address, an ordinary person can still easily link the two transmissions and identify which user watched what video(s).  This is because the two transmissions to Google contain the same Google Analytics client ID (here, "327728830.1715860236"), specifically "for Google Analytics to determine which traffic belongs to which user[.]"[38]

## VI.    Defendant Discloses Class Members' PII and Video-Viewing Information to Yahoo

43.    The dynamic analysis found that when a CC+ user watches a pre-recorded video on the Website, Defendant discloses to Yahoo, via the Yahoo Dot, the user's (i) hashed email address, and (ii) the title and URL of the video the user is

---

[38] GOOGLE, [UA] HOW USERS ARE IDENTIFIED FOR USER METRICS [LEGACY], https://support.google.com/analytics/answer/2992042.

watching.   This is evinced by the following network transmissions from the CC+ Website:

**Yahoo Analytics** is an analytics service from Yahoo that collects information about site visitors to better understand how people use them and how they respond to ads

We observed **Yahoo Analytics** obtaining:

`Video Information` in the form of:
- Video Title
- Video ID
- Video URL

`Personal Information` in the form of:
- Hashed Email

```
https://sp.analytics.yahoo.com/sp.pl
URL PARAM:
   a: 10000
   b: - Cowboy Channel+
   .yp: 10191112
   he:
   7d45c459f5cc2739b9104f384f8e2f9dad96
   6bca38ff75848fe1a382bd59d3d8
   f:
https://www.cowboychannelplus.com/Ac
count/Signup
   e:
https://www.cowboychannelplus.com/wa
tch
   enc: UTF-8
   yv: 1.15.1
   et: custom
   ec: Account
   ea: NFR Subscription
   el: CC+ Monthly Recurring
Subscription - NFR not incl.
   ev: 9.99
   gv: 9.99
   tagmgr: gtm
```

```
https://sp.analytics.yahoo.com/sp.pl
URL PARAM:
   a: 10000
   d: Thu, 16 May 2024 11:53:50 GMT
   n: 4d
   b: Kimes Essence Exchange - Day 1
- Cowboy Channel+
   .yp: 10191112
   f:
https://www.cowboychannelplus.com/pl
ay/59784
   e:
https://www.cowboychannelplus.com/sh
ow/433
   enc: UTF-8
   yv: 1.15.1
   tagmgr: gtm
```

44.    That Defendant discloses to Yahoo, via the Yahoo Dot, the user's hashed e-mail address is shown by the blue highlight.

```
   b: - Cowboy Channel+
   .yp: 10191112
   he:
   7d45c459f5cc2739b9104f384f8e2f9dad96
   6bca38ff75848fe1a382bd59d3d8
   f:
https://www.cowboychannelplus.com/Ac
```

45.    That Defendant discloses to Yahoo, via the Yahoo Dot, the title and URL of the video the user is watching, is shown by the yellow highlights.  Here, the title of the video was "Kimes Essence Exchange - Day 1."  The URL of the video was "https://www.cowboychannelplus.com/play/59784."

```
   b: Kimes Essence Exchange - Day 1
- Cowboy Channel+
   .yp: 10191112
   f:
https://www.cowboychannelplus.com/pl
ay/59784
```

46.    Although Defendant discloses a user's video-viewing information to Yahoo in a separate transmission from the user's hashed e-mail address, an ordinary person can still easily link the two transmissions and identify which user watched what video(s).  This is because the two transmissions to Yahoo are mapped/connected via a session cookie – specifically, the "A3 cookie[, which] stores a unique identifier which [Yahoo] use[s] to display and measure advertising."[39]

## VII.  Defendant Discloses Class Members' PII and Video-Viewing Information to Third Parties for the Purposes of Marketing, Advertising, and Analytics

47.    Defendant transmits the foregoing PII and video-viewing information to Meta, Google, and Yahoo so that Meta, Google, and Yahoo can help Defendant launch marketing campaigns, target specific users with advertising, and analyze CC+ Website user data.

### A.    Meta Pixel

48.    According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[40]  The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[41]  Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[42]  Advertisers can also create their own tracking parameters by building a

---

[39] Yahoo, Cookie Policy, https://legal.yahoo.com/ie/en/yahoo/privacy/cookies/index.html.

[40] Meta, Meta Pixel, https://developers.facebook.com/docs/meta-pixel.

[41] Meta, Meta Pixel Get Started, https://developers.facebook.com/docs/meta-pixel/get-started.

[42] Meta, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655.  See also Meta, Standard Events, https://developers.facebook.com/docs/meta-pixel/reference.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    15

"custom event."[43]

49.    This gathered information is used for marketing and advertising. Specifically, the Meta Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[44]

50.    Taking these one by one, "track[ing ] website visitors' actions[,] also known as conversion tracking[,] … can be used to analyze the effectiveness of [a] conversion funnel and to calculate [] return[s] on ad investment[s]."[45]  Once a client is "tracking conversions, [Meta] recommend[s] that [the client] use them to … optimize [] ads for website conversions."[46]

51.    A "custom audience is an ad targeting option"[47] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[48] Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[49]  Advertisers can

---

[43] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[44] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[45] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[46] *Id.*

[47] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[48] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[49] *Id.*

target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[50]

52.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[51] Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[52]

53.    In short, Meta states[53] that the Meta Pixel can be used to:

- Make sure your ads are shown to the right people. Find new customers, or people who have visited a specific page or taken a desired action on your website.
- Drive more sales. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.
- Measure the results of your ads. Better understand the impact of your ads by measuring what happens when people see them.

54.    Gathered information is also used for analytics.  Namely, the Meta Pixel helps "understand[] the actions people take on [a] website."[54]  "Examples of actions include adding an item to their shopping cart or making a purchase. The pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Meta] Events Manager. From there, [a client will] be able to see the actions that [its] customers take."[55]  This allows Meta clients to "segment [their] website visitors into

---

[50] *Id.*

[51] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[52] *Id.*

[53] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153.

[54] *Id.*

[55] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    17

groups based on the actions they have taken on [their] website."[56]  Additionally, with the Meta Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[57]

55.    Defendant uses the Meta Pixel for such marketing, advertising, and analytics purposes.

**B.    Google Analytics**

56.    According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[58] Google describes these reports and insights as follows[59]:

> Real-Time Reporting
> - Monitor activity on your site or app as it happens.
>
> Acquisition Reports
> - See how users land on your site or app and understand the effectiveness of your marketing.
>   - o User Acquisition[:] Discover how users reach your site or app through different paid and organic sources.
>   - o Traffic Acquisition[:] See a session-based view of traffic and engagement on your site or app through different paid and organic traffic sources.
>
> Engagement Reports
> - Better understand what content drives engagement and conversions on your site or app.
>   - o Events Report[:] Get a detailed view of user actions, system events, or errors.

---

[56] META, CUSTOM AUDIENCES, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences.

[57] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005.

[58] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[59] GOOGLE, ANALYTICS FEATURES, https://marketingplatform.google.com/about/analytics/features/.

  o Conversion Report[:] See how all your marketing channels are working together to drive conversions.

  o Pages and Screen Report[:] See which web pages and app screens users engage with the most.

 Monetization Reports

  • See how much revenue your site or app generates whether it's from ecommerce, subscriptions, or ads.

   o Ecommerce[:] Analyze purchase activity including product and transaction information, average purchase revenue, average purchase revenue per user, and other data.

   o In-App Purchases[:] Improve your app monetization with insights about the highest performing products and subscriptions.

   o Publisher Ads[:] See ad revenue that your app generates using the Google Analytics for Firebase SDK.

57. This gathered information is used for marketing and advertising. Specifically, Google "Analytics is designed to work seamlessly with other Google solutions and partner products" and can "unlock deeper insights into [advertising] campaign performance from Google Ads, Display & Video 360, and Search Ads 360."[60] Google Analytics integrates with Google Ads so that clients, like Defendant, can "[s]ee [] Ads data together with [] website and app performance data in the Google Ads reports in Analytics."[61] Google Analytics integrates with Display & Video 360 and Search Ads so that clients, like Defendant, can "[e]xport conversions created in Analytics[,]" "create audiences that are predicted to take [certain] actions[,]" and "use them for automated bidding" in Display & Video 360 and Search Ads.[62]

58. Gathered information is also used for analytics. With Google Analytics, clients, like Defendant, can "apply[] Google's machine learning models, … analyze [] data[,] and predict future actions people may take, like making a purchase or

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

churning."[63]   Additionally, Google Analytics can "automatically detect and surface actionable insights from [gathered] data like important changes, new trends, and other growth opportunities[.]"[64]   And Google can provide "[a]nswers to [marketers' q]uestions … in natural language[,] … to quickly find [] metric[s], report[s], or insights[.]"[65]   Through Google Analytics' "[u]ser [e]xploration" functions, it is even possible to "[s]elect specific groups of users and drill down deeper to understand how those users engage with [a] site or app."[66]

59.   Thus, Google Analytics furnishes "a complete understanding of [] customers across devices and platforms[,] … [and] gives [] the tools[] … to understand customer journey and improve marketing ROI."[67]   Defendant uses Google Analytics for such marketing, advertising, and analytics purposes.

**C.   Yahoo Dot**

60.   According to Yahoo, the Yahoo Dot is a tracking "pixel[] that work[s] across the Yahoo DSP [(Demand Side Platform).]"[68]   Gathered data "commonly includes information such as cookies and/or device identifiers, IP address, time spent, [] interactions, links clicked, [] location, apps on the device, or advertisements viewed."[69]   This data is collected "on behalf of [Yahoo] customers, such as [] advertisers and publishers, so that they can assess the effectiveness of their services."[70]

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] GOOGLE, ANALYTICS OVERVIEW, https://marketingplatform.google.com/about/analytics/.

[68] YAHOO, PIXELS, https://help.yahooinc.com/dsp-api/docs/pixels.

[69] YAHOO, YAHOO ANALYTICS, https://legal.yahoo.com/us/en/yahoo/privacy/topics/analytics/index.html.

[70] *Id.*

61.    After setting up the Yahoo Dot using the Yahoo DSP (i.e., by "creat[ing] a Pixel ID (yp ID) in the Yahoo DSP"[71]), the Yahoo DSP can be used for marketing and advertising.  This includes "ad targeting" to "curated audience segments."[72] Specifically, after a Yahoo Dot client "create[s] rules in the Yahoo DSP that describe the targeting and/or conversion audience[(s)]"[73] that they wish to target—which can be based on factors such as "behavior, interests, life stage, search, and many other categories"[74]—the Yahoo DSP helps to "find [such] people across any screen"[75] with advertisements.  It is possible for clients, like Defendant, to use "[b]uild people-based or contextual data segments" to target; target "over 450 highly scaled and accurate [standard] audience segments"; and "leverage deep learning to analyze over a million attributes in an audience seed and categorize users according to their probability to convert."[76]

62.    Gathered information is also used for analytics.  Clients, like Defendant, can utilize "planning tools" to "truly understand [their] consumer[s] across commerce, travel, content, and more[,]" and to "visualize and compare [audience] insights across geos, segments, behaviors and demographics."[77]  Further, "optimization tools" can help "make strategic decisions about bidding and budgeting[]" for advertisements, "[r]eveal meaningful insights[,] and evaluate campaigns[.]"[78]  And "measurement

---

[71] YAHOO, YAHOO PIXEL API, https://help.yahooinc.com/identity/docs/yahoo-pixel-api.

[72] YAHOO, TARGETING TOOLS, https://www.advertising.yahooinc.com/our-dsp/target.

[73] YAHOO, YAHOO PIXEL API, https://help.yahooinc.com/identity/docs/yahoo-pixel-api.

[74] YAHOO, TARGETING TOOLS, https://www.advertising.yahooinc.com/our-dsp/target.

[75] *Id.*

[76] *Id.*

[77] YAHOO, PLANNING TOOLS, https://www.advertising.yahooinc.com/our-dsp/plan.

[78] YAHOO, OPTIMIZATION TOOLS, https://www.advertising.yahooinc.com/our-dsp/optimize.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    21

tools" can "uncover actionable insights[,] … [f]rom lift studies to muti-touch attribution to frequency analysis, [all of which help] to measure and validate the impact of [clients'] omnichannel [advertising] investments."[79]

63.    Defendant uses the Yahoo Dot for such marketing, advertising, and analytics purposes.

## VII. Defendant Knowingly Discloses Class Members' PII and Video-Viewing Information to Meta, Google, and Yahoo

64.    Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses CC+ Website users' personally identifiable information and video-viewing information to Meta, Google, and Yahoo.

65.    First, as outlined above, Defendant "knew that [CC+] was collecting data from users that identified personalized information about them because, in exchange for the data, [Meta, Google, and Yahoo] provided [Defendant] with analytics allowing [Defendant] to provide advertisements tailored to specific users." *Saunders v. Hearst Television, Inc.*, 2024 WL 126186, at *4 (D. Mass. 2024).

66.    Indeed, Defendant admits in the CC+ Cookie Policy—which is not "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" pursuant to 18 U.S.C. § 2710(b)(2)(B)(i)—that "we [] use cookies provided by trusted third parties. … The site uses Google Analytics … for helping us to understand how you use the site and ways that we can improve your experience. These cookies may track things such as how long you spend on the site and the pages that you visit so we can continue to produce engaging content. … As we sell products it's important for us to understand statistics about how many of the

---

[79] YAHOO, MEASUREMENT TOOLS, https://www.advertising.yahooinc.com/our-dsp/measure.

visitors to our site actually make a purchase and as such this is the kind of data that these cookies will track."[80]

67. Second, the code for the Meta Pixel, Google Analytics, and the Yahoo Dot did not spontaneously appear on the CC+ Website. Instead, the third parties' code was purposefully installed by Defendant into the HTML documents and/or other libraries defining the contents of their Website. In order to obtain the third parties' code for the Meta Pixel, Google Analytics, and the Yahoo Dot, Defendant needed to contract with Meta, Google, and Yahoo specifically for those third parties' marketing, advertising, and analytics services. Meta explains: "to set up a pixel[,] … set up the pixel base code on your website. … [To do so, g]o to Meta Events Manager."[81] Google explains: to "set up Google Analytics for [a] website or app … [y]our first step is to set up an Analytics account[.]"[82] Yahoo explains: the Yahoo Dot is a tracking "pixel[] that work[s] across the Yahoo DSP [(Demand Side Platform).]"[83] To use the Yahoo Dot, one must "create a Pixel ID (yp ID) in the Yahoo DSP."[84]

68. Therefore, Defendant knowingly and intentionally provides personal information and video-viewing information to Meta, Google, and Yahoo for marketing, advertising, and analytics services.

---

[80] COWBOY CHANNEL PLUS, COOKIE POLICY, https://www.cowboychannelplus.com/faq-cookiepolicy.

[81] META, HOW TO SET UP AND INSTALL A META PIXEL, https://www.facebook.com/business/help/952192354843755?id=1205376682832142. *See also* META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started ("Before you can install the Pixel, you will need your Pixel's base code, which you can find in the Ads Manager > Events Manager.").

[82] GOOGLE, [GA4] SET UP ANALYTICS FOR A WEBSITE AND/OR APP, https://support.google.com/analytics/answer/9304153?hl=en.

[83] YAHOO, PIXELS, https://help.yahooinc.com/dsp-api/docs/pixels.

[84] YAHOO, YAHOO PIXEL API, https://help.yahooinc.com/identity/docs/yahoo-pixel-api.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    23

## VIII.  Experience of Plaintiff

69.    Plaintiff Lindsy Saarloos is a resident and citizen of Apple Valley, California.  In or around July 2022, Plaintiff created and paid for a CC+ account. Shortly thereafter, Plaintiff began using the CC+ Website and her CC+ account to watch various pre-recorded videos.  Plaintiff most recently watched a pre-recorded video on the Website using her CC+ account in or around September 2024.

70.    By subscribing to and paying for CC+, Plaintiff received access to watch exclusive CC+ live and pre-recorded videos, in addition to other benefits.

71.    At all relevant times, Plaintiff never consented to, agreed to, or otherwise permitted Defendant to disclose her PII and video-viewing information to third parties, including Meta, Google, and Yahoo.

72.    Likewise, Defendant never gave Plaintiff the opportunity to prevent the disclosure of her PII and video-viewing information to third parties, including Meta, Google, and Yahoo.

73.    Nevertheless, each time Plaintiff viewed a pre-recorded video on the CC+ Website, Defendant disclosed Plaintiff's PII and video-viewing information to Meta, Google, and Yahoo via the Meta Pixel, Google Analytics, and the Yahoo Dot, respectively.

74.    Defendant disclosed Plaintiff's: (i) Facebook browser ID value stored in the _fbp browser cookie, and (ii) video-viewing information (including titles and URLs of videos watched, as well as video interactions) to Meta via the Meta Pixel. Below is an image of Plaintiff's activity off Meta technologies, showing that the Meta Pixel received Plaintiff's data from the Website on December 21, 2022.[85]  This image was retrieved from Plaintiff's Facebook account, which she created on or around March 8, 2010.  The day pictured, December 21, 2022, was but one time that Plaintiff

---

[85] META, REVIEW YOUR ACTIVITY OFF META TECHNOLOGIES, https://www.facebook.com/help/2207256696182627.

accessed her Facebook account on the same web browser that she used to access the CC+ Website.



75.    Defendant disclosed Plaintiff's: (i) hashed e-mail address, (ii) Google Analytics client ID, and (iii) video-viewing information (including titles and URLs of videos watched) to Google via Google Analytics.

76.    Defendant disclosed Plaintiff's: (i) hashed e-mail address, and (ii) video-viewing information (including titles and URLs of videos watched) to Yahoo via the Yahoo Dot.

77.    Using this information, Meta, Google, and Yahoo were able to identify Plaintiff and attribute her video viewing records to an individualized profile of Plaintiff.  Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Meta, Google, and Yahoo.  Meta, Google, and Yahoo compiled Plaintiff's PII and activity on the CC+ Website (including video-viewing information), which Defendant used and continues to use for marketing, advertising, and analytics purposes.

## CLASS ALLEGATIONS

78.    Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who subscribed to CC+, watched videos on the Website, and subsequently had their PII transmitted to a third party (the "Class").

79.    Subject to additional information obtained through further investigation

and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

80.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of CC+, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

81.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a)     whether Defendant collected Plaintiff's and Class Members' PII;

(b)     whether Defendant unlawfully disclosed and continue to disclose CC+ users' PII, including their video-viewing records, in violation of the VPPA;

(c)     whether Defendant's disclosures were committed knowingly; and

(d)     whether Defendant disclosed Plaintiff's and Class Members' PII without consent.

82.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, watched videos on CC+ (specifically, the Website) and had her PII collected and disclosed by Defendant to third parties Meta, Google, and Yahoo.

83.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor her counsel have

any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class, and Plaintiff will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

84. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
**Violation of the VPPA,**
**18 U.S.C. § 2710**

85. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

86. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

87.    Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as Defendant provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via CC+.

88.    Plaintiff and members of the Class are "consumers" as defined by the VPPA because they created CC+ accounts with their personal information such as first and last name, date of birth, country, and e-mail address, paid for their subscriptions, obtained access to exclusive video content as a result, and subsequently watched videos through those accounts on the CC+ Website.  18 U.S.C. § 2710(a)(1).  Under the VPPA, this means that they were "subscriber[s]" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

89.    Plaintiff and members of the Class viewed pre-recorded videos using the CC+ Website.  During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to third parties.  Specifically, Defendant disclosed Plaintiff's: (i) Facebook browser ID value stored in the _fbp browser cookie, and (ii) video-viewing information (including titles and URLs of videos watched, as well as video interactions) to Meta via the Meta Pixel.  Defendant disclosed Plaintiff's: (i) hashed e-mail address, (ii) Google Analytics client ID, and (iii) video-viewing information (including titles and URLs of videos watched) to Google via Google Analytics.  Defendant disclosed Plaintiff's: (i) hashed e-mail address, and (ii) video-viewing information (including titles and URLs of videos watched) to Yahoo via the Yahoo Dot.

90.    The information disclosed by Defendant constitutes "personally identifiable information" because it makes it "reasonably and foreseeably likely to reveal which [CC+] videos [Plaintiff and members of the Classes] [] obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016); *see also* 18 U.S.C. § 2710(a)(3).  Indeed, the information disclosed by Defendant to Meta,

Google, and Yahoo enables even an ordinary person to identify which specific videos were watched by Plaintiff and specific members of the Class.

91.    Defendant's transmissions of Plaintiff's and Class Members' PII to Meta, Google, and Yahoo via the Meta Pixel, Google Analytics, and the Yahoo Dot, respectively, constitute "knowing[] disclosures" of Plaintiff's and members of the Classes' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).  Defendant "knew that [CC+] was collecting data from users that identified personalized information about them because, in exchange for the data, [Meta, Google, and Yahoo] provided [Defendant] with analytics allowing [Defendant] to provide advertisements tailored to specific users." *Saunders,* 2024 WL 126186, at *4.

92.    Plaintiff and the Class Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties, including Meta, Google, and Yahoo.

93.    Nor were Defendant's disclosures of Plaintiff's and Class Members' PII made in the "ordinary course of business" as the term is defined by the VPPA. Defendant's disclosures to Meta, Google, and Yahoo were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

94.    On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For an award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated:  September 25, 2024          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _/s/ Brittany S. Scott_
          Brittany S. Scott

Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700

E-mail: bscott@bursor.com

*Attorney for Plaintiff*